Green, J.
delivered the opinion of the court.
It appears from this record, that in 1824, Ignatius Jones, of the county of Wilson, made his last will and testament, whereby he bequeathed to the complainants (who were then his slaves) their freedom, after certain limited periods of service, which periods have now expired. The testator appointed Zedekiah Tate, his son-in-law, and John G. Graves, his executors. The testator died in a few days after the execution of the will, and at the September term, 1824, the Executors produced the will in the county court of Wilson, and it was regularly proved by Hugh Tilford and William Murray, the subscribing witness thereto; and was duly recorded.
In 1826, it appears from the record, Winneford Jones, relict of the testator appeared in the county court, and called for a re-probate of said will, — whereupon the Executors appeared in court and waived the necessity of a citation,' — and an issue of devisavit vel non was formed, and at March term, 1827, was tried before a jury and determined, against the validity of the will.
The complainants now file their bill alleging that the said proceedings whereby the probate of the will was set aside, and the issue found against the will, was procured by a fraudulent combination between Winneford Jones the widow of the testator, and Zedekiah Tate who was executor of his will, and his son-in-law.
*391 The Executors, — and all those persons who claim title to the ■complainants, are made parties to the bill.
It is not questioned, but that a court of Chancery has jurisdiction to set aside a judgment or decree, in any court, for fraud in obtaining the same. 1 Story’s Eq. Juris., 252-254. The only question upon this part of the case therefore is, whether there is evidence of the fraud charged in the bill.
John G. Graves, one of the Executors whose deposition has been regularly taken, — states, that Tate, his co-executor, employed the lawyer to break the will, that he heard Tate tell his lawyer, that he wanted the will broke as far as the negroes were concerned, and that he was willing the balance of the will should stand. The witness thought there was something going on that was not right, and declined having any thing more to do with the will.
The facts stated by this witness are conclusive as to the existence of the fraud. Tate had qualified as Executor of the will, and had taken an oath to execute it faithfully. It was his duty to maintain its validity if assailed, by the aid of counsel and the production of all the testimony in his power. Instead of doing this, according to the evidence of Graves, he colludes with the widow of the testator, — induces her to appear and contest the will, and himself employs counsel to break it. This was a gross violation of duty and a corrupt disregard of his high trust. He was placed by the law in a position to represent the interests of all those who were beneficiaries under the will, (for it was a proceeding in rem and if fair was obligatory upon all persons, whether parties or not,) and when, instead of sustaining those interests, he engages counsel for, and combines with their adversaries, to defeat the provisions of the will in their favor, he is guilty of the grossest fraud, and in this case the more culpable, because of the helpless condition of the complainants. But it is said Graves is not worthy of credit, and that his testimony ought not to prejudice the defendants.
There is no testimony impeaching the general character of Grave, and his position as Executor, and some slight discrepancies in his statements, constitute the grounds of attack. It is true that as Executor, Graves should have stood forward and *392 opposed the fraudulent proceedings of Tate, But being a stranger, having no interest in the estate, when he saw the family of the testator combining to invalidate the will, he seems to have chosen to withdraw from the matter altogether rather than to enter into collision with his co-executor. Improper, and censurable as his conduct was, there are many honest men of mild, irresolute dispositions, who would have acted as Graves did; and we do not think his conduct was such as to render his state, ment on oath unworthy of credit.
But if Graves’ testimony were questionable, there is much in this record to sustain him and to establish the fraud.
Tate had married the daughter of the testator, and when the will was set aside, he became the owner of the greater number of these negroes. That his interest was therefore against the establishment of. the will is manifest from his declarations to various persons. Soon after the issue was found against the will, Tate said to Kirkpatrick that he could always break such a will as that. He told his son James Tate that the “offset” he and Winneford Jones had made against the will was unlawful, and advised him not to purchase any of the negroes and he told Cherry Oneal, that if the negroes had sense enough they could get their freedom. These statements plainly show that he was active in opposition to the establishment of the will, and that he knew the determination of the issue had been obtained by unlawful means, and against the truth of the case.
The fraud being thus clearly established, it vitiates all the proceedings that were thereby procured in setting aside the original probate of the will, as well as the verdict and judgment upon the issue. The consequence is, that upon a decree, setting aside the proceedings in the county court of Wilson, by which the original probate was cancelled in and the issue found against the will, the probate of 1824, of this will, becomes reinstated in all its vigor. Without deciding whether his honor the Chancellor, had power to submit an issue of devisdvit vel non; (taking the character of a proceeding in rem and binding all persons, whether parties or not) to be tried by a jury in his own court, we have no difficulty in coming to the conclusion *393 that the parties to this suit are concluded by the proceedings of the Chancery Court.
Upon the application of the defendants, the Chancellor submitted an issue to a jury to try the question whether the paper of the 4th of July, 1824, was the will of Ignatius Jones. That issue was found in favor of the will, and estops any of the parties in this case from proceeding hereafter in any other forum to investigate that question.
As to the claim set up by Tate, to the negro John, as having been given to him by the testator, on the marriage of Tate to his daughter; we are satisfied, from the proof, that no such gift was made.
We think therefore, that the complainants are entitled to their freedom by the will of their former owner, which will has been regularly proved and recorded.
The assent of their owner having been thus given, it remains only that the assent of the State shall be given, through the organ regularly constituted, by law to give that assent.
By the act of 1829, ch. 29, the Court of Chancery was au-thorised to give the assent of the State in cases of emancipation by will, where the Executor should fail or refuse to apply to the County Court. But the act of 1831, ch. 101, declares that the act of 1829, shall not be construed so as to extend to any case, where persons may have been directed to be set free by will made before the passage of that act. This court in Hincklin vs. Hamilton, 3. Hump. R., 569, determined that the act of 1831, is a repeal of the act of 1829, so far as that act may apply to cases of wills directing slaves' to be set free before its passage.
In this case, the will was made, and the testator died before the passage of the act of 1829. The complainants may therefore apply to the County Court of Wilson, to be liberated as directed in the will of Ignatius Jones, their former owner.
In the meantime, the cause will be retained in this court, that after such emancipation shall be granted by the said county court, an account may be taken, and the rights of the parties adjusted in this cause. With this modification the decree of the Chancellor will be affirmed.